**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MATSON,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **AXA EQUITABLE** | : | |
| **LIFE INSURANCE COMPANY, et al.,** | : | **No. 10-5361** |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                      **September 15, 2011**

   This is an Employee Retirement Income Security Act ("ERISA") case. James Matson claims that he is disabled and unable to work. He seeks long-term disability benefits under a policy he had through his employer and administered by the Life Insurance Company of North America ("LINA"). LINA contends that Matson has failed to produce satisfactory evidence that he qualifies as disabled under the policy and therefore refuses to pay him long-term disability benefits. Matson also has a policy with the AXA Equitable Life Insurance Company ("AXA"). AXA is currently paying long-term disability benefits to Matson under this policy but has a disagreement with Matson about the amount of an offset to which AXA is entitled as a result of social security disability benefits Matson is receiving. LINA also claims that any benefits it must pay Matson are subject to a similar offset provision. Before the Court are the cross-motions for summary judgment of all parties. For the reasons that follow, the Court will grant Matson summary judgment against LINA on the issue of payment of long-term disability benefits, deny LINA's motion for summary judgment on that issue, grant summary judgment to AXA and LINA on the issue of the offset, and deny Matson's motion for summary judgment on the offset issue. Finally, the Court will deny Matson's request for attorneys' fees.

## I.      BACKGROUND

### A.      The Policy

Matson worked as a senior program analyst at Quest Diagnostics, Inc. (LINA's Statement of Undisputed Facts in Supp. of Mot. for Summ. J. [LINA's Undisputed Facts] ¶ 1.) He participated in both Quest's short-term and long-term disability benefits plans.  (*Id.* ¶ 2.) Quest provided benefits under the short-term disability plan, which LINA administered.  (*Id.* ¶ 3.) Matson could receive a maximum benefit of twenty-six weeks under the short-term disability policy.  (*Id.*) Matson's long-term disability benefits were provided through a policy issued by LINA.  (*Id.* ¶ 4.)

According to the long-term disability policy, the employee "must provide the Insurance Company . . . satisfactory proof of Disability before benefits will be paid. . . . The Insurance Company will require continued proof of the Employee's Disability for benefits to continue." (J.A. at 366.)  The long-term disability policy provided:

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1.      unable to perform the material duties of his or her Regular Occupation; and
2.      unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, her or she is:

1.      unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2.      unable to earn 60% or more of his or her Indexed Earnings.

2

The Insurance Company will require proof of earnings and continued Disability.

(*Id*. at 361.)  "Regular Occupation" is defined as:

> The occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location.

(*Id*. at 377.)  Thus, for the first two years of a claimed disability, to receive long-term disability benefits, a participant must provide satisfactory proof that he cannot perform the duties of his own occupation.  (LINA's Undisputed Facts ¶ 10.)  After two years, the participant must provide satisfactory proof that he cannot perform the duties of any occupation.  (*Id*.)

### B.  Matson's Medical History

On February 26, 2001, Matson had surgery for a herniated disc.  (J.A. at 495.)  On February 13, 2006, Matson complained of chronic and worsening leg cramps, numbness, and limited movement.  (J.A. at 511.)  As a result, he received steroid injections on February 13 and March 2, 2006. (*Id*. at 509, 513.)  Matson had right L4-L5 microdiscectomy surgery on March 28, 2006 to alleviate intractable right leg pain that radiated up the right side of his body.  (*Id*. at 498.)  On January 4, 2007, Matson had a C5-6 and C6-7 anterior cervical discectomy and fusion due to radiating neck and right arm pain.  (*Id*. at 501.)  Following a liver biopsy, Matson was diagnosed with chronic hepatitis in 2008.  (*Id*. at 520.)

Matson saw Dr. Jeffrey Friedman in April of 2007 to address his pain issues.  Dr. Friedman noted that although Matson's right hand was much improved, Matson continued to report numbness in both hands along with ongoing neck and shoulder pain and lower back discomfort.  (*Id*. at 543.)

An MRI in February of 2009 "did not show anything worrisome from the surgical standpoint"

although Matson continued to complain about neck tightness and radiating discomfort.  (*Id*. at 528.)

Matson's shoulder was examined in June of 2009, and he was diagnosed with tendinosis with full

thickness or near full thickness tear in the mid-tendon.  (*Id*. at 531.)  On September 3, 2009, Dr.

Elliot Leitman performed surgery on Matson to repair a torn right rotator cuff.  (*Id*. at 505.)

Matson also had MRIs in February and March of 2010 to follow up on the chronic pain he

was experiencing.  The imaging revealed a moderate focal right central disc protrusion and severe

right neural foraminal stenosis.  (J.A. at 535-41.)  On February 25, 2010, a lumbar spine MRI of

Matson displayed bulging discs causing minimal compression of the thecal sac and moderate to

severe right and moderate to severe left neural foraminal stenosis.  (*Id*. at 482.)  A February 26, 2010

cervical spine MRI showed bulging discs, a flattening of the spine, and moderate to severe bilateral

neural foraminal stenosis.  (*Id*. at 477.)  A thoracic spine MRI performed a month later showed a T2-

T3 disc protrusion causing a severe right neural foraminal stenosis.  (*Id*. at 480.)  On March 29,

2010, Dr. William Murphy evaluated Matson and noted Matson's chronic, radiating pain as well as

his bilateral L5-S1 radiculopathy.  (*Id*. at 485.)  On April 15, 2010, Dr. Murphy noted that Matson

complained of neck and lower back pain, and shoulder weakness.  The EMG study performed

showed bilateral C5 and left C6 radiculopathy.  (*Id*. at 473.)  Dr. Murphy maintained that Matson

was "disabled from all employment pending further response to treatment" and that Matson's

prognosis for full recovery and return to gainful employment was poor.  (*Id*. at 471.)

Dr. Edward Murphy, Psy.D., performed a neuropsychological screening evaluation on

Matson on June 10, 2010.  He noted that Matson reported significant persistent pain,

lightheadedness, and depression.  (*Id*. at 408.)  Matson also experienced persistent fatigue that

worsened when he had to concentrate on tasks.  (*Id*.)  The evaluation showed that Matson's

4

automatic memory skills were intact, and he showed no impairment in his verbal fluency.  (*Id*. at 409.)  Matson was taking Oxycontin, Oxycodone, and Xanax.  (*Id*.)  There was no indication of any cognitive rigidity or inflexibility in his thinking, but "[i]t is evident that pain factors and/or medications tend to diminish his ability to sustain attention on tasks. . . . [His] deficits are likely more noticeable from a functional standpoint.  Mr. Matson tends to tire quickly with tasks involving mental activity."  (*Id*. at 409-10.)  Murphy did not find a neurological basis for Matson's complaints but deemed it common for people with severe pain to show deficits in terms of functional attention and memory abilities.  (*Id*. at 410.)  He concluded that Matson was "disabled from returning to his employment.  Cognitively, he would have a difficult time meeting the demands of his work as his symptoms of chronic pain, fatigue, and medications would significantly tend to interfere in his ability to complete his job functions on a day-to-day basis.  His symptoms have continued to exacerbate over several years."  (*Id*.)

At some point after receiving a diagnosis of dizziness, memory loss, and unspecified idiopathic neuropathy, Matson was referred to a neurologist, Dr. Philip Adelman.  (*Id*. at 551.)  Dr. Adelman, whose office had tracked Matson's progress since February of 2006, also provided his opinion on Matson's ability to work.  Based on his review of Matson's file, he opined that Matson was disabled from all employment.  (*Id*. at 467.)  He concluded that Matson's chronic pain prevented him from effectively functioning on a daily basis and that Matson would be unable to "reliably work in a sedentary capacity seated at a computer terminal and concentrate as has been required in his previous job capacity.  It is my opinion that he would not be able to function reliably and effectively in any work capacity given his overriding pain syndrome."  (*Id*.)

Matson completed a Functional Capacity Evaluation on March 19, 2010.  Matson was

required to perform a number of tasks as part of the evaluation.  He was able to complete the sitting task, though he frequently shifted, grimaced, and reported back pain.  (*Id.* at 554-55.)  He was not able to complete the standing task and reported low back and right leg pain.  (*Id.* at 555.)  Matson was unable to walk slowly on a treadmill or climb stairs due to fatigue and pain in his lower back and right hip.  (*Id.*)  He could not maintain his balance when requested to squat or crouch and was forced to "literally crawl[] out of and back into a chair utilizing it for significant support."  (*Id.* at 556.)  He struggled to reach overhead, showing decreased motion; he also reported increasing low back and leg pain when making repetitive foot motions.  (*Id.* at 557.)  He failed to meet the twenty-fifth percentile when his static lifting ability was measured, which indicated a performance deficiency.  (*Id.* at 559.)  He also performed poorly on tests measuring how quickly and accurately he could work with his hands.  (*Id.* at 560.)  Overall, his "performance demonstrated limitations in sedentary and dynamic activities. His performance does not meet his job requirements." (*Id.* at 553.) In conclusion, while Matson maintained a consistent effort, he showed "minimal physical work capabilities and tolerances based on the results to this Assessment."  (*Id.* at 560.)

### C.    LINA's Review

Matson's last day of work at Quest was June 26, 2009.  (LINA's Undisputed Facts ¶ 15.)  He began receiving short-term disability benefits on July 10, 2009; those benefits would continue until January 7, 2010, provided he remained disabled.  (*Id.* ¶ 17.)  LINA certified Matson's short-term disability claim through December 15, 2009.  (*Id.* ¶ 18.)  On November 3, 2009, LINA informed Matson that it received his request for long-term disability benefits and that it would contact his doctors for additional information.  (J.A. at 284.)  On November 11, 2009, LINA wrote to Matson that, "[w]e have completed our review of your claim for Long Term Disability (LTD) benefits.

Based on the information on file, we have determined that at this time you satisfy the definition of Disability from your contract." (*Id*. at 272.)  His benefits would commence on January 8, 2010, following exhaustion of his short-term disability benefits, and would total $3,385 per month. (*Id*.)

On January 12, 2010, Matson was notified that his long-term disability claim was denied because LINA determined that "the medical evidence on file does not support a disability to the extent that you would be disabled from performing the material duties of your occupation as a Senior Programmer/Analyst." (*Id*. at 238.)  The denial letter to Matson referenced a lack of documented loss of muscle strength or sensation and pointed out that Matson reported no specific limitations that would render him unable to perform the material duties of his job. (*Id*.)  It was for these reasons that Matson's short-term disability benefits also were terminated beyond December 14, 2009.  (LINA's Undisputed Facts ¶ 29.)  After his claim was denied, Matson submitted additional material in support of his request for long-term disability benefits, but LINA refused to alter its position. (*Id*. ¶¶ 30, 33-40, 49.)

LINA's denial relies heavily on the notes of Dr. Leitman, the surgeon who repaired Matson's rotator cuff.  Following the surgery, Leitman imposed a restriction on Matson that forbade him from lifting or using his right shoulder.  Dr. Leitman believed that Matson could return to work without restrictions by October 30, 2009. (J.A. at 670.)  Furthermore, he felt that Matson was recovering nicely from surgery and noted that Matson could return to work provided he did no lifting above his shoulder, no lifting of more than two pounds, and "no repetitive use." (*Id*. at 590, 594.)  In December of 2009, Dr. Leitman reported that Matson could return to work but was restricted from lifting more than twenty pounds and "above shoulder use." (*Id*. at 585.)

LINA also referred Matson's medical records to Rose Marie Antonucci, a Vocational

Rehabilitation Counselor employed by LINA.  In her notes, she concluded that because Matson worked in a sedentary job that required standard desk level use of bilateral upper extremities, a twenty-pound lifting limitation coupled with no overhead reaching would not prevent him from performing his job.  (*Id*. at 586.)

On January 5, 2010, Jean Kozik-Kulis, a LINA nurse case manager, spoke with Dr. William Murphy, and he told her that Matson's neck and back pain prevented him from returning to work.  (LINA's Undisputed Facts ¶ 26.)  Kozik-Kulis balked at the lack of evidence to support Dr. Murphy's assessment that Matson could not return to work.  (*Id*.)  Dr. Seiferth, LINA's Assistant Medical Director, reviewed Matson's file. Dr. Seiferth's opinion was that Matson's pain did not prevent him from returning to work because he could function at his job.  (J.A. at 570.) Additionally, there was no documented loss of muscle strength or loss of sensation and therefore the restrictions placed on Matson by his doctors were "reasonable but greater than current sedentary job demands regarding shoulder."  (*Id*.)

When LINA asked Dr. William Murphy if he agreed with Dr. Leitman's restrictions, he indicated that he did—"in terms of [Matson's] right shoulder." (*Id*. at 569.)  But he also opined that Matson should not engage in repetitive bending, stooping, climbing, pushing, pulling, carrying, prolonged sitting or standing, or overhead lifting.  (*Id*.)

David Hassick, a vocational rehabilitation counselor for LINA, reviewed Matson's Functional Capacity Evaluation.  He deemed the results of the evaluation inconclusive due to "sketchy" information.  (*Id*. at 54.)  Hassick found it curious that desk-level reaching was not addressed.  (*Id*.) He also believed that a number of the tests performed were not relevant to Matson's job and was concerned that Matson's consistency and sincerity of effort were judged by subjective

observations.  (*Id.*)

At the behest of LINA, Dr. Russell Green conducted an Independent Peer Review of Matson's file. Dr. Green concluded that Dr. William Murphy failed to support his opinion of Matson's disability with "an adequate physical examination," and therefore the restrictions Dr. Murphy placed on Matson "are not supported by his documentation." (*Id.* at 398.)  Dr. Green also took issue with Dr. Adelman's conclusion that Matson was disabled because "there is no physical examination in [the] report." (*Id.*)  He also deemed the neuropsychological opinion of Dr. Edward Murphy unsupported, suggesting that Matson's concentration and memory issues are "not of a severe nature." (*Id.*)  He believed that Murphy's restrictions were "based on issues relating to pain and not function" and that Murphy failed to find "any obvious defects that would support issues of memory or cognitive deficit." (*Id.*)  Dr. Green concurred with Dr. Leitman's opinion that Matson's rotator cuff surgery was successful and that he was able to return to work after December 22, 2009. (*Id.* at 398-99.)  According to Dr. Green, restrictions and limitations could not be offered based on imaging and neurosensory testing, and the functional task summary and recommendations from the Functional Capacity Evaluation of March 19, 2010 were unsupported because they were not linked to Matson's job performance. (J.A. at 399.)  Ultimately, "on the basis of the limited information available, there may be restrictions in range of motion and some ongoing pain in the neck . . . there may be some restrictions of motion, and as evidenced by the neurosensory testing there may be some neuropathic symptoms." (*Id.*)  Dr. Green did not believe Matson needed to be restricted with regard to walking, sitting, or standing, or "on fingering or hand activities." (*Id.*)  There was no evidence that Matson's medication caused him cognitive deficits, and he saw no reason why Matson could not work a full eight-to-ten-hour day. (*Id.*)

9

LINA denied Matson's appeal on August 13, 2010.  It based that decision on a lack of measurable tests to show Matson's pain rendered him disabled; lack of disc herniations, nerve root compressions, or spinal stenosis in his MRIs; no evidence of neuropathy; no evidence that Matson suffered from severe concentration or memory issues; and Dr. Leitman's decision that Matson could return to work at the end of 2009.  (LINA's Undisputed Facts ¶ 49.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial.  *Anderson*, 477 U.S. at 248.  In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). A court must apply the same standards to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987); *see also St. Paul Fire & Marine Ins. Co. v. Primavera*

10

*Software, Inc.*, Civ. A. No. 09-3908, 2011 WL 3438077, at *3 (E.D. Pa. Aug. 5, 2011).

## III.   DISCUSSION

### A.   Denial of Benefits

The parties agree that this Court must review Matson's claim using a *de novo* standard.  *See Viera v. Life Ins. of N. Am.*, 642 F.3d 407, 414-18 (3d Cir. 2011) (holding that policy language requiring "proof satisfactory" to the insurance company for a finding of disability did not shield insurance company from *de novo* review).  Under a *de novo* standard of review, the reviewing court must determine whether the administrator's decision to deny benefits was wrong and affords the administrator's decision no deference or presumption of correctness.  *Id*. at 413-14.  Rather, "[t]he court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan."  *Id*. at 414.

LINA contends that Matson established that he suffers from neck and back pain.  But what he failed to establish—and what the policy requires that he establish—was that his pain renders him functionally unable to perform his sedentary job as a computer programmer.  Thus, "[w]ithout some objective measurement of Plaintiff's functional limitations, LINA had no way to determine whether he was impaired to the point that he could not perform his job."  (LINA's Mem. of Law in Supp. of Mot. for Summ. J. [LINA's Summ. J. Mem.] at 16.)

Having reviewed the record, this Court concludes that LINA erred and that Matson produced evidence satisfactory to show that he is disabled under the LINA policy. Under the LINA policy, Matson was disabled if he was unable to perform the material duties of his job. LINA claims that Matson put forth no objective measurement of any functional limitations that suggested he could not

perform his job.  LINA's insistence on an objective measure of functional incapacity adds an additional hurdle not required by the LINA policy.  LINA's policy includes no requirement that an insured can qualify as disabled only if he or she submits objective proof satisfactory to LINA.  Nor does the policy foreclose a participant's medical providers' objective assessments based on the participant's medical complaints from satisfying his or her burden. Dr. William Murphy determined that Matson was disabled from all employment, and Dr. Edward Murphy believed Matson's symptoms would significantly interfere with Matson's ability to function at his job. Both of these opinions address Matson's ability to function at his job as a result of his symptoms.

Furthermore, the record is replete with evidence documenting the source of Matson's pain and medical issues as well as evidence that that pain has caused Matson a significant decrease in functioning.  According to the Department of Transportation's occupational requirements for a Programmer-Analyst, Matson was required to frequently reach, handle, and finger, as well as make judgments and decisions and deal with people.  (J.A. at 599.)  A sedentary position like Matson's also involved occasional lifting, carrying, pushing, and pulling of ten pounds and may have required standing or walking for brief periods of time.  (*Id*.)  Although the Functional Capacity Evaluation Matson performed included tests not relevant to his job, he failed to perform competently on some tasks he would be required to perform.  For example, he reported back pain while sitting, could not reach overhead, and tested poorly on all levels of the dexterity/handling/manipulation test.

Matson underwent numerous MRIs showing bulging discs, stenosis, radiculopathy, and a flattening of the spine.  This objective evidence explains the pain and discomfort felt by Matson. This evidence supports the results of the Functional Capacity Evaluation and assessments offered by his medical providers that Matson could not return to work because he could not function at his

12

job.  Accordingly, the Court concludes that Matson has offered satisfactory proof not only that he is in pain, but that he cannot function at his job because of that pain.

LINA directs the Court to *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), to support its position that the word of a plaintiff's treating physician is not dispositive on the issue of disability.  Indeed, this Court is mindful of the Supreme Court's statement that ERISA does not require plan administrators to "accord special deference to the opinions of treating physicians.  Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id*. at 831.  LINA also relies on case law that suggests a decision to deny benefits is not arbitrary when based on substantial evidence even if that decision is contrary to the decision of the beneficiary's doctor.  (LINA's Summ. J. Mem. at 18.) Whether LINA's decision was arbitrary is not the issue.  Rather, the Court holds that given the evidence before it, LINA's decision was wrong.  Additionally, *Nord* "does [not] insulate plan decision makers whenever they reject a treating physician's opinion in favor of a consultant's opinion." *See Kaufman v. Metro. Life Ins. Co.*, 658 F. Supp. 2d 643, 649 (E.D. Pa. 2009). LINA uncovered no evidence that called into question Matson's diagnoses or the cause of his pain. Instead, LINA's consultants took issue with the import of those diagnoses. LINA merely sought to poke holes in the evidence Matson introduced without marshalling any of its own. LINA's tactic—to knock down Matson's evidence, leaving him without satisfactory proof of disability—evinces a disagreement with the ultimate assessment from those who examined Matson. If LINA disagreed with the conclusions of Matson's doctors, it could have sought an independent medical examination ("IME") to support its decision. *See Schwarzwaelder v. Merrill Lynch & Co.*, 606 F. Supp. 2d 546, 560 (E.D. Pa. 2009) ("Courts have noted the particular appropriateness and helpfulness of an IME where the disability claim encompasses significant

13

inherently subjective complaints."). Of course, LINA was not required to subject Matson to an IME before it could deny him benefits. But left only with the evidence from Matson and the disagreements raised by LINA's representatives, and in the context of a *de novo* review, this Court holds that Matson has offered satisfactory proof of his disability pursuant to LINA's policy.

**B.    The Offset**

LINA's policy also includes an offset provision that reads:

> **Other Income Benefits**
>
> An Employee for whom Disability Benefits are payable under this Policy may be eligible for benefits from Other Income Benefits. If so, the Insurance Company may reduce the Disability Benefits by the amount of each Other Income Benefits.
>
> Other Income Benefits include:
> 1. any amounts received (or assumed to be received*) by the Employee or his or her dependents under:
> - the Canada and Quebec Pension Plans;
> - the Railroad Retirement Act;
> -any local, state, provincial or federal government disability or retirement plan or law payable for Injury or Sickness provided as a result of employment with the Employer;
> - any sick leave or salary continuation plan of the Employer;
> - any work loss provisions in mandatory "No-Fault" auto insurance.
> 2. any Social Security disability or retirement benefits the Employee or any third party receives (or is assumed to receive*)
> . . .
> 4.    any proceeds payable under any franchise or group insurance or similar plan. If other insurance applies to the same claim for Disability, and contains the same or similar provision for reduction because of other insurance, the Insurance Company will pay for its pro rata share of the total claim. "Pro rata share" means the proportion of the total benefit that the amount payable under one policy, without other insurance, bears to the total benefits under all such policies.

(J.A. at 367.)

In addition to the LINA policy, Matson purchased a disability policy with AXA. The AXA policy included a Supplemental Social Security Rider (the "Rider"), which Matson purchased for an additional premium. Under the Rider, Matson was eligible for an additional benefit if he qualified for total disability benefits and was not engaged in gainful employment. (AXA's Mot. for Summ. J. Ex. B [AXA Policy Rider].)  To calculate this additional benefit, Matson would take the amount of the Rider, in this case $1000, and subtract any "Social Insurance Benefits." (*Id.*)  "Social Insurance Benefits" included "benefits due to Your disability for which You may qualify under the U.S. Social Security Act, as amended. This includes Primary benefits for You . . . payable due to your Disability." (*Id.*)

AXA has been paying Matson monthly benefits under the AXA Policy. The Social Security Administration deemed Matson disabled as of June 26, 2009 and determined that he would be eligible for social security disability benefits beginning in December of 2009. (J.A. at 437.)  His social security disability benefits were calculated at $2,209 per month. (*Id.*)

Matson argues that AXA's Policy regarding its right to an offset is ambiguous and that the Rider offered him an illusory promise if both LINA and AXA are permitted to full offsets of any social security disability benefits he receives. (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. [Pl.'s Summ. J. Mem.] at 25.)  Matson suggests that this Court should read the AXA Policy and LINA's policy in tandem. Because AXA pays 55% of Matson's total benefit and LINA should pay 45%, each insurance company should be entitled to offset Matson's Social Security disability payments in a like manner. (*Id*. at 26-27.)

AXA sees no ambiguity in its policy, which it notes was issued before LINA's policy. Furthermore, Matson's attempt to conjure up ambiguity is based on legal legerdemain: he asks the

15

Court to read in conjunction two separate insurance policies issued by two different companies at two different times. (AXA's Mem. of Law in Supp. of its Resp. in Opp'n to Pl.'s Mot. for Summ. J. [AXA's Opp'n] at 2-3.)

LINA argues that its policy includes an offset and makes no exception for proration of that offset because Matson chose to purchase additional disability insurance. (LINA's Summ. J. Mem. at 19-20.)

In Pennsylvania, the court, not a jury, generally performs the function of interpreting an insurance contract. *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005). The court's task is to unearth the parties' intention as evidenced by the words used in the insurance policy. *See id*. When the language of an insurance policy is clear and unambiguous, a court must enforce that language. *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999) (citing *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)). If, however, the policy provision is ambiguous, it is interpreted in favor of the insured. *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007). A contract is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense. *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008) (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429-30 (Pa. 2001)).

Matson may not like the Rider or the offset provisions included in the insurance policies, but that does not render them ambiguous, nor does it mean he purchased an illusory promise. Both policies clearly contain provisions that allow a full offset in the event that Matson received social security disability benefits. Contrary to Matson's assertion, the AXA Policy does not guarantee that he will receive additional money regardless of the amount of the social security disability benefit.

16

The benefit conferred by the Rider is not illusory simply because there were circumstances under which AXA's offset amount exceeded the benefit conferred by the Rider and thus Matson was not entitled to additional benefits from AXA above the base amount it paid him. As counsel for AXA noted at oral argument, it was possible that AXA could find Matson disabled under its policy yet the Social Security Administration paid Matson no benefits or benefits less than the amount of the Rider. In such a case, Matson would receive benefits from AXA in excess of his base benefit.

Matson seeks to have this Court rewrite the AXA Policy such that he was only obligated to pay for the Rider if he received more money from AXA, and if he did not, AXA would not be entitled to the full offset in accordance with the clear language of the AXA Policy. The Court doubts that AXA would have agreed to such a provision, and there is nothing equitable about Matson's proposed offset distribution. Indeed, as AXA points out, if Matson's suggestion was adopted, his disability income from the two policies would exceed his work income by over $1,000 a month. (AXA's Opp'n at 4.)

Likewise, LINA's offset provision is not ambiguous and it is entitled to subtract the full amount of Matson's social security disability benefits from the benefit it owes Matson, in accordance with the terms of their agreement.

### C.      Attorneys' Fees

Matson seeks an award of attorneys' fees against LINA. ERISA grants district courts the discretion to award a "reasonable attorney's fee and costs of action." 29 U.S.C. § 1132(g)(1). A plan beneficiary need not be a "prevailing party" to qualify for attorneys' fees under ERISA. *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2156 (2010). Instead, a claimant must show some degree of success on the merits that can be characterized as more than trivial. *Id.* at 2158.

17

Clearly, Matson has achieved some success on the merits of his claims. In deciding whether to exercise its discretion and award attorneys' fees, the Court turns to the five factors set forth by the Third Circuit in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983). *See Templin v. Independence Blue Cross*, Civ. A. No. 09-4092, 2011 WL 3664427, at *4 (E.D. Pa. Aug. 19, 2011). The *Ursic* factors are: (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions. *Ursic*, 719 F.2d at 673. A district court must consider all five *Ursic* factors, but absent exceptional circumstances, there is no presumption of an award of attorneys' fees to a successful ERISA plaintiff. *Tomasko v. Weinstock*, 255 F. App'x 676, 680 (3d Cir. 2007).

Under the first *Ursic* factor, attorneys' fees may be awarded upon a showing of bad faith, ulterior motive, or blameable or reprehensible conduct, even without a showing of malice or a guilty purpose. *McPherson v. Emps.' Pension Plan of Am. Re-Ins. Co.*, 33 F.3d 253, 257 (3d Cir. 1994). However, "[a] party is not culpable merely because it has taken a position that did not prevail in litigation." *Id*. Although Matson contends that LINA's conduct "suggests bad motive," the Court does not see evidence to support that contention. LINA did not ignore or refuse to consider Matson's evidence or even suggest Matson was not experiencing pain. LINA disagreed with the ultimate conclusion of disability asserted by Matson's doctors and attempted to support its position with opinions and analysis from its personnel using Matson's evidence. That conduct is neither bad faith nor culpable. This factor weighs against awarding attorneys' fees.

LINA has nothing to say on the issue of whether it can satisfy an attorneys' fee award in this

18

case, so the Court will accept Matson's argument that LINA's ability to pay weighs in his favor.

Matson has nothing to say on the issue of the benefits conferred on members of the plan as a whole,

and the Court sees no reason why correcting LINA's decision benefits others. This factor weighs in

LINA's favor.

The deterrence factor requires that courts consider whether an award of attorneys' fees would

serve the objectives of ERISA by dissuading similar conduct in the future. *Id*. at 258. Perhaps an

award of attorneys' fees would encourage LINA to conduct an independent medical examination

when faced with a claimant experiencing largely subjective symptoms but whose doctors state cannot

work. But the law does not require LINA to accept without investigation the disability determination

of a claimant's doctor, and the Court does not believe that an award of attorneys' fees here will alter

LINA's conduct.

The final factor to consider—the relative merits of the parties' positions—addresses the

losing parties' arguments compared to the victorious claimant's. *Addis v. Ltd. Long-Term Disability

Program*, Civ. A. No. 05-357, 2006 WL 2387087, at *3 (E.D. Pa. Aug. 3, 2006). Of course, this

Court found Matson's position stronger than LINA's, but that fact alone is insufficient to tip this

factor in Matson's favor. *See Brown v. Cont'l Cas. Co.*, Civ. A. No. 99-6124, 2005 WL 1949610,

at *2 (E.D. Pa. Aug. 11, 2005). However, because LINA did not perform an independent medical

examination and sought to prove its position only through discrediting Matson's doctors, this factor

weighs slightly in favor of awarding fees.

The absence of bad faith or culpable conduct, coupled with the lack of a deterrent to be

achieved through an award, leads this Court to decline to award attorneys' fees.

### D.     Prejudgment Interest

Matson seeks 6% interest on the past due benefits owed him by LINA. (Pl.'s Summ. J. Mem. at 27.)  LINA objects to Matson's request for interest on past due benefits as well as the 6% interest rate suggested by Matson. (LINA's Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 14 n.5.)  LINA requested additional time to brief the matter if necessary.

Prejudgment interest on delayed ERISA benefits is a "presumptively appropriate" equitable remedy left to the discretion of the trial court. *Goldstein v. Assocs. in Gastroenterology of Pittsburgh Amended & Restated Pension Plan*, 137 F. App'x 441, 445 (3d Cir. 2005); *see Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 207-08 (3d Cir. 2004) ("We now make explicit that . . . an ERISA plaintiff who prevails . . . may request prejudgment interest . . . as part of his or her benefits award."). "It is to be awarded 'when the amount of underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of the money which was legally due.'" *Goldstein*, 137 F. App'x at 445 (quoting *Anthuis v. Colt Indus. Operating Corp.,* 971 F.2d 999, 1010 (3d Cir. 1992)).

Because LINA did not address the issue in this round of briefing, the Court cannot address whether LINA has overcome the presumption in favor of an award of interest. The Court will delay a final decision and afford LINA the opportunity to address the issue if the parties are unable to reach an agreement. The parties should also discuss the 6% interest rate sought by Matson because he did not provide a basis for seeking that amount, which would constitute an eyebrow-raising return on investment in the current economic climate.

**IV.     CONCLUSION**

LINA's decision to deny long-term disability benefits to Matson was wrong. The Court will give the parties an opportunity to resolve the issue of prejudgment interest on the delayed benefits. As outlined in their respective insurance policies with Matson, both LINA and AXA are entitled to offset the full amount of Matson's social security benefits. Finally, the Court declines to award attorneys' fees to Matson's lawyers. An Order consistent with this Memorandum will be docketed separately.